

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 7, 2025

**BY ECF AND E-MAIL**
The Honorable George B. Daniels
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States* v. *Kareem Adams*, 24 Cr. 365 (GBD)

Dear Judge Daniels:

    In December 2023, shortly after completing a 78-month state term of imprisonment, defendant Kareem Adams sold crack cocaine to an undercover member of law enforcement (the "UC"). Over the following months, the defendant continued to sell crack cocaine to the UC, each time at the same location: inside, or in front of, a residential apartment building (the "Apartment Building") in a public housing complex in Manhattan's Chelsea neighborhood. The defendant kept a gun to protect his territory while he sold. On a night in April 2024, while the defendant was in his drug territory—directly in front of the Apartment Building—he fired that gun repeatedly in the air. Fortunately, no one was hurt. He was arrested soon afterward on a federal complaint.

    This Court is scheduled to sentence the defendant on November 12, 2025—assuming that the defendant is willing to attend. As the Court is aware, on five occasions the defendant refused to leave the MDC to appear in this Court. On six other occasions, the defendant refused production on a writ issued by New York County Supreme Court, which sought to arraign the defendant in a separate case in which he has been indicted for committing a criminal sexual act on a minor. The defendant has persisted in those refusals despite being warned by the Court of the consequences.

    The defendant faces a statutory sentencing range of five years to life, and an advisory sentence under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") of 60 months. An above-Guidelines sentence is necessary to satisfy the Section 3553(a) factors. Such a sentence is needed to deter the defendant: the instant conviction is the defendant's fourteenth criminal conviction. He promptly re-engaged in criminal conduct after completing a 78-month sentence, which was imposed, in turn, after the defendant completed a separate 72-month sentence and re-offended soon afterward. An above-Guidelines sentence is also necessary to promote respect for the law, in light of the defendant's repeated refusals to come to court. Accordingly, for these reasons, and those described further below, the Government submits that a sentence of at least 96 months (eight years) is necessary to satisfy the Section 3553(a) factors.

Hon. George B. Daniels  Page 2
November 7, 2025

## I. Background

### A. Offense Conduct

From at least late 2023 until the defendant's arrest in May 2024, he sold crack cocaine in the New York City Housing Authority's Chelsea Houses in Manhattan. (Presentence Investigation Report, dated September 15, 2025 ("PSR") ¶ 5). The defendant primarily sold narcotics inside of, or in the vicinity of, the Apartment Building, which is located at 415 West 25th Street in Manhattan. (PSR ¶ 5). The defendant worked with others, whom he supplied, to sell together, and he sold drugs seven days per week. (PSR ¶ 6). When the defendant did so, he frequently had access to a gun, sometimes carrying a gun on his person. (PSR ¶ 5).

Members of law enforcement identified the defendant as a drug seller in the area and purchased from him. On the afternoon of December 19, 2023, the UC bought crack cocaine from the defendant in the lobby of the Apartment Building. (PSR ¶ 6). That night, while hanging out with others in the lobby of the Apartment Building, the defendant was shot in the lower leg. (PSR ¶ 7). The shooting was captured on video, and the individual who shot the defendant, Damel Thomas—who also shot the defendant's brother near the Apartment Building that night—was prosecuted in this District and sentenced by Judge Woods to nine years' imprisonment in September 2024. (PSR ¶ 7 & n.1).

Despite having been shot on December 19, 2023—and despite being arrested less than one month later (January 17, 2024) for assaulting his romantic partner (PSR ¶ 41)—the defendant continued selling drugs. Specifically, between February 27 and April 4, 2024, the defendant sold crack cocaine to the UC on four more occasions. (PSR ¶ 6). Each sale took place inside of, or next to, the Apartment Building. (PSR ¶ 6).

Several weeks later, on the evening of April 25, 2024, the defendant brandished a gun while he was in front of the Apartment Building and fired approximately six times into the air. (PSR ¶ 9). The shooting was captured on video, and the defendant was arrested by federal agents several weeks later.[1] (PSR ¶ 10).

### B. Procedural History and Applicable Guidelines Range

On June 6, 2024, a grand jury in this District returned an indictment charging the defendant with narcotics conspiracy and with possessing ammunition after a felony conviction. (Dkt. No. 6). On July 23, 2024, the grand jury returned a superseding indictment charging the defendant with an additional count of possessing a firearm during and in relation to a drug trafficking crime, which firearm was brandished and discharged, in violation of 18 U.S.C. § 924(c). (Dkt. No. 13).

On June 25, 2025, the defendant pleaded guilty to a lesser-included Section 924(c) count, possessing a firearm during and in relation to a drug trafficking crime, which subjected him to a

Hon. George B. Daniels                                                                                       Page 3
November 7, 2025

five-year mandatory minimum sentence (as compared to the ten-year mandatory minimum sentence he would have faced had he been convicted of the Section 924(c) count as charged). The defendant pleaded guilty pursuant to a written plea agreement, in which the parties agreed that (i) the defendant faces a mandatory 60-month term of imprisonment, which term shall be imposed to run consecutive to any other term of imprisonment imposed, and (ii) the advisory Guidelines sentence is 60 months' imprisonment, pursuant to U.S.S.G. § 2K2.4, which does not take into account the defendant's Criminal History Category. Those calculations are consistent with the calculation reflected in the PSR (PSR ¶ 21), which recommends a Guidelines sentence of 60 months.

## II. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

## III. Discussion

<u>Defendant's Conduct, His History, and Need for Deterrence:</u>  Given the facts of this case and the defendant's background, an above-Guidelines sentence of at least 96 months is necessary to account for the nature of the conduct, the defendant's history, and the need for deterrence.

The defendant's conduct is serious: repeatedly selling crack cocaine and then firing multiple shots in the air from that drug territory, feet away from a 20-story apartment building in one of New York City's most densely-populated neighborhoods. There is a reason that Congress provided enhanced penalties for individuals who possess firearms while selling drugs. Armed drug dealers attract violence, putting innocent people's lives at risk. The hundreds of families who live in the Chelsea Houses, and who use the playground next to the Apartment Building (below), should not have to witness drug transactions in the middle of the day. Nor should they have to listen to gunfire at 9 p.m. on a Thursday night, just as parents are putting their children to sleep.



Hon. George B. Daniels  Page 4
November 7, 2025

    The defendant's criminal history makes this conduct all the more troubling. In 2011, the defendant was sentenced in the state to 72 months' imprisonment for criminal possession of a weapon. (PSR ¶ 34). About one year after completing that term of imprisonment, he assaulted an individual during a robbery. (PSR ¶ 36). The defendant was arrested again, pleaded guilty to second-degree assault, and was sentenced to 78 months' imprisonment. (PSR ¶ 36). He completed his term of imprisonment in March 2023, and later that year, while still on parole, the defendant began selling crack cocaine to the UC. (PSR ¶ 36). A sentence of 96 months is necessary to achieve deterrence, given that the defendant has re-engaged in criminal conduct after serving 72-month and 78-month terms of imprisonment. Neither those lengthy sentences, nor the shorter sentences Those lengthy sentences, as well as numerous shorter prison sentences the defendant has served as a result of his thirteen prior convictions, have failed to deter him from continuing to break the law.

    The defense's submission attempts to minimize the defendant's conduct and criminal history, but the Court should reject those arguments. One assertion the defense submission makes is that the defendant's "arrest in this case stems from his having himself been the victim of a shooting." (Dkt. No. 47 at 2). The UC, however, bought crack cocaine from the defendant prior to the night of December 19, 2023—in other words, the defendant unquestionably began selling drugs <u>before</u> he was shot. (PSR ¶ 6). After the defendant was shot, this Office promptly prosecuted and detained the individual who shot him. Yet despite being shot while standing at the front door of the Apartment Building, and despite the defendant's purported safety concerns about the area, within a few months the defendant resumed selling drugs in front of the same Apartment Building. Those facts lead to one conclusion: the reason the defendant fired his gun in front of the Apartment Building that night is so that he could safely sell drugs there. That is not mitigating in any way.

    The defense submission also asserts that the defendant engaged in only a few small drug sales. In particular, the submission objects to the portion of the PSR that states that the defendant sold drugs seven days per week, that he worked with others to do so, and that the conspiracy was responsible for selling at least 280 grams of crack cocaine. (*See* PSR ¶ 6). The facts are supported in the record, however. There is no dispute that the defendant sold crack cocaine to the UC five times between December 19, 2023, and April 5, 2024, and one can infer that those transactions were not the only times that the defendant sold drugs.[2] Video of several of those purchases shows the defendant working with at least one other individual. (PSR ¶ 6). And, as the Government has explained to defense counsel, the estimate of the weight for which the defendant's conspiracy was responsible comes from witness statements, and defense counsel confirmed to the Government shortly after filing the defense submission that the defense is not seeking a *Fatico* hearing.

Hon. George B. Daniels  Page 5
November 7, 2025

      The defense submission also implies that the Government improperly enhanced the charges against the defendant in order to seek a higher sentence. The facts, however, contradict that suggestion. After law enforcement agents identified the defendant as the individual who fired the shots on April 25, 2024, they moved quickly to locate and arrest him, initially doing so on a complaint. (Dkt. No. 1). Once the defendant was arrested, the Government had 30 days to indict him, and did so by charging two readily-provable offenses, narcotics conspiracy and felon-in-possession of ammunition. (Dkt. No. 6). In the meantime, the Government developed additional evidence of the scope of the defendant's narcotics activity and motivation for the shooting. As it did, after the indictment of the defendant, the Government conveyed to defense counsel that it would likely seek additional charges. When defense counsel offered to resolve the case by pleading guilty to the charges in the initial indictment, the Government declined to do so, noting that those charges did not reflect the seriousness of the defendant's conduct. That conduct, of course, was the possession (and discharge) of a firearm used in a drug conspiracy. That is the crime that the superseding indictment charged the defendant with, and the crime to which he pleaded guilty (admitting to the lesser-included possession charge). Put simply, the charge in the superseding indictment captured exactly what the defendant did.

      The advisory Guideline sentence for a Section 924(c) charge does not account for the defendant's criminal history. A defendant with no prior convictions who engaged in the same conduct that the defendant has admitted to here would face the same 60-month advisory Guideline sentence. Accordingly, an above-Guideline sentence is necessary to reflect the defendant's significant criminal history, and the fact that he has continued to engage in serious criminal conduct despite having previously served 72-month, and 78-month, prison sentences.

      <u>Promoting Respect for the Law</u>: An above-Guidelines sentence is also necessary to promote respect for the law. The defendant has repeatedly committed serious crimes soon after being released from prison, and while on state parole, which reflects disrespect for the law. But the defendant's conduct while detained on this case has made the point clear.

      After appearing for his arraignment before this Court on June 11, 2024, the defendant refused to appear on September 3, 2024; October 2, 2024; January 28, 2025; and April 1, 2025. When the defendant did appear for the May 14, 2025 status conference, he told the Court the following:

> I would like to say I apologize to the to the courtroom for not appear[ing in] court. It was an issue at MDC with me being shot the person that shot me was in MDC so this is why I wasn't coming to court. I was afraid to come to court. And this is the reason why I wasn't coming to court. Because the person that shot me was at MDC, he was sending hits out to get me cut. Etc., etc. This is why I wasn't coming to court. That person is no longer at MDC. He went to his jail wherever he went out so now I'm appearing at court. I don't feel afraid coming to court so I'm at court now, sir.

(Dkt. No. 37 at 22).

      The Government confirmed with the Bureau of Prisons, however, that Damel Thomas—the person who shot the defendant—left the MDC on October 8, 2024, after being sentenced by

Hon. George B. Daniels  Page 6
November 7, 2025

Judge Woods. The defendant's statement thus does not explain why he was willing to come to Court on June 11, 2024 (while Thomas was still at the MDC) but not on January 28 or April 1, 2025 (months after Thomas had left the MDC to his designated facility outside of New York State).[3] Nor does the defendant's statement, or the defense submission, explain why it would be safer to remain at the MDC—where the purported threats were taking place—than to leave the facility to go to court.

Several other facts cast further doubt on the defendant's purported explanation for his repeated refusals to come to court. Last month, on October 8, 2025, the defendant was involved in a fight at the MDC, which the defense suggests was connected to the purported threats the defendant has faced. As reflected in BOP records produced to the defense, however, when the defendant was treated by MDC medical staff after that altercation, he told medical staff, in reference to the other inmate: "he owes be [sic] $1500." While the defendant was placed in the SHU after that incident, defense counsel contacted the Government to request that the defendant be moved out of the MDC, confirming on October 24, 2025, that the defendant wished to be moved. The Government forwarded the request and the defendant was moved from the MDC to his current facility six days later, on October 30, 2025. That was the first time that the Government received any request to move the defendant.

The defendant has also repeatedly refused to appear in state court. As the Court is aware, the defendant was indicted in New York County Supreme Court last year and charged with one count of criminal sexual act in the second degree—alleging that he engaged in oral sexual contact with the vulva of a person under the age of 15 years old, in May 2024, shortly before his federal arrest—and one count of endangering the welfare of a child. A New York State Supreme Court justice has signed a writ on six occasions to produce the defendant to be arraigned on that indictment. Each time, the U.S. Marshals approved the "day writ," but on each occasion the defendant has refused production. After the most recent refusal, on October 29, 2025, the U.S. Marshals reported that the defendant told correctional staff that he was refusing to leave his cell because he wished to "complete his federal process first."

Those facts reflect a stunning disregard for the judicial process. The defendant has continued to refuse to come to court despite being warned of the consequences and being told that he needs to do so. He has attempted to dictate when, and where, he will be prosecuted. The defendant's criminal history in itself supports a sentence of at least 96 months' imprisonment—an incremental increase from his most recent state sentences that is necessary to achieve meaningful deterrence. His refusal to participate in the judicial process further underscores that such an above-Guidelines sentence is necessary.

---

[3] After making that statement at the May 14, 2025 status conference, the defendant also refused to appear in Court on June 10, 2025, before attending on June 25, 2025, and entering his guilty plea.

Hon. George B. Daniels Page 7
November 7, 2025

### IV. Conclusion

For those reasons, the Government respectfully requests that the Court impose a sentence of at least 96 months' imprisonment and a term of supervised release of five years.[4]

                Respectfully submitted,

                JAY CLAYTON
                United States Attorney for the
                Southern District of New York

By: _/s/ Patrick R. Moroney_

                Patrick R. Moroney
                Alexandra S. Messiter
                Assistant United States Attorneys
                (212) 637-2330 / -2544

Cc (via ECF and e-mail):    Sarah Sacks, Esq.

---

[4] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b).  *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).